[No. 36579.   Department Two.   August 29, 1963.]

THE STATE OF WASHINGTON, *on the Relation of Jean Beddall, Appellant,* v. BERNARD G. LONCTOT *et al., Respondents.**

*Reported in 384 P. (2d) 877.

*Casey & Pruzan,* for appellant.

*The Attorney General, David C. Cummins* and *Morton M. Tytler, Assistants,* for respondents.

DONWORTH, J.—This is an appeal from a judgment and decree denying the issuance of a writ of prohibition to prevent respondents from sitting as members of a hearing committee in a proceeding to revoke certain licenses issued to appellant under the provisions of the Beauty Culture Act.

Appellant-relator, Jean Beddall, owns and operates a school of beauty culture in the city of Renton. She is the holder of three licenses issued to her under the provisions of RCW chapter 18.18. Appellant is licensed (1) to conduct a school of hairdressing and beauty culture, (2) to act as a "manager-operator," and (3) to act as an "instructor-operator."

A verified complaint charging appellant with violating provisions of the Beauty Culture Act, RCW chapter 18.18, relating to the operation of a beauty school, was filed with the director of the Department of Licenses by the secretary of the Washington State Beauty Culture Board. The complaint prayed for the revocation or suspension of each of appellant's three licenses.

A copy of the complaint was served upon appellant. Thereafter, the director of the Department of Licenses petitioned the Governor to appoint respondents Alfa Burpee and Dollie M. Wolff to serve with the director, or her authorized representative, as members of a hearing committee to hear and determine the charges made against appellant. Acting upon that petition, the Governor appointed respondents Burpee and Wolff as members of the hearing committee.

On December 7, 1961, all respondents convened as a hearing committee. Appellant moved that each of the respondents disqualify himself as a member of the committee. The motion was denied. Thereafter, on the same day, appellant secured and served upon the hearing committee an application and affidavit for writ of prohibition, and an order to show cause why a writ of prohibition should not issue.

At the trial on the above matters, appellant challenged the authority of respondent Bernard G. Lonctot to sit on the hearing committee in place of the director of the Department of Licenses and the authority of respondents Burpee and Wolff to sit on the hearing committee as "qualified practitioners of the profession or calling" of appellant. This challenge to the composition of the hearing committee was based on the allegation that it was not legally constituted as required by RCW 43.24.110 which provides as follows:

"Whenever there is filed with the director of licenses any complaint charging that the holder of a license has been guilty of any act or omission which by the provisions of the law under which the license was issued would warrant the revocation thereof, verified in the manner provided by law, the director of licenses shall request the governor to appoint, and the governor shall appoint, two qualified practitioners of the profession or calling of the person charged, who, with the director, shall constitute a committee to hear and determine the charges and, in case the charges are sustained, impose the penalty provided by law. The decision of any two members of such committee shall be the decision of the committee.

"The appointed members of the committee shall receive ten dollars per day for each day spent in the performance of their duties and in going to and returning from the place of hearing, and their actual and necessary traveling expenses."

The trial court decided the issues adversely to appellant. She has not challenged the trial court's holding that Mr. Lonctot has the right to sit in place of the director although he is named as one of the defendants. Therefore, we direct our attention to the question of whether respondents Burpee and Wolff (hereafter referred to as if they were the sole respondents) are "qualified practitioners of the profession or calling of the person charged," and whether these respondents are biased against appellant to the extent of preventing her from having a fair hearing. The latter issue was considered a part of the former by appellant under the term "qualified."

As previously pointed out, appellant is the holder of three licenses issued under the provision of RCW chapter

18.18, to wit, (1) to conduct a school of hairdressing and beauty culture, (2) to act as a "manager-operator," and (3) to act as an "instructor-operator." Appellant owns and operates a beauty school.

Respondent Burpee is the holder of a "manager-operator" license and a "shop location" license. She is the owner of three beauty shops.

Respondent Wolff is the holder of (1) a "manager-operator" license, (2) an "instructor-operator" license, and (3) a "shop location" license. She is the owner and operator of a beauty shop. Prior to 1950, she was the owner of a beauty school and had taught in other beauty schools.

Appellant's position is that the owners and managers of beauty shops are members of a different, competitive, and hostile calling from that of the owners and managers of beauty schools. On this issue, the trial court held that the relator (appellant) and the respondents Burpee and Wolff are licensed beauty operators, and their common calling is that of hairdressing, beauty culture, and cosmetology. We agree with the trial court's ruling in this respect.

The statutory provisions governing the operation of beauty schools and beauty shops are included in the same chapter. The same state license (manager-operator) is necessary to authorize a person to manage a beauty school as is required to manage a beauty shop. Appellant and respondents are all holders of this license and are actively working under its authority. That one is teaching beauty culture and the other practicing beauty culture is not a distinction that means they are members of a different calling. This is especially true where the students in the schools practice beauty culture upon members of the public in the course of their instruction, as in the instant case. We hold that respondents are qualified practitioners of the same calling as appellant within the meaning of RCW 43.24.110.

In reaching the above conclusion, we have not been unmindful of our holding in *McDonald v. Goddard*, 2 Wn. (2d) 553, 98 P. (2d) 1074 (1940). In that case, we held that an order of the industrial welfare commission fixing the minimum wage for an experienced operator in the beauty cul-

ture industry was not applicable to one employed in a beauty school as an instructor. At the time of that decision, the applicable statute did not require an instructor to have the qualification of a licensed "operator." This is not true today. RCW 18.18.010 (10). There is language in the decision in the cited case which favors the position of appellant. However, that language was used in a completely different factual setting, and the issue here involved is not the same as in the *McDonald* case.

We shall consider the question of the alleged disqualification of respondents for bias separately from the question already dealt with of whether they are qualified practitioners of the same calling as appellant, since, in our opinion, it presents an entirely different issue.

The facts pertaining to whether respondents Burpee and Wolff are disqualified to act as members of the hearing committee, because of bias and prejudice due to a pecuniary interest in the outcome of the hearing and/or hostility to appellant and her beauty culture school, are as follows:

A part of the training of students in beauty schools must necessarily include some actual experience. Students perform acts of beauty culture upon members of the public under the supervision of an instructor. The schools charge for student work, but, by statute (RCW 18.18.210), no charge is permitted until the student has completed 400 hours of instruction and practice. Schools operating in this manner are called commercial beauty schools, and they are common throughout the United States. The schools charge substantially less for the work of students than is charged by beauty shops for work performed. The beauty shops consider the schools as competitors even though patrons are choosing between the work of students and that of fully trained beauty operators.

Some beauty shop owners and employees are members of the Beauticians' Union. Respondent Wolff, a beauty shop owner in Seattle, belongs to Local 195-A of the Beauticians' Union. An offshoot of the Beauticians' Union is the Washington State Hairdressers' Guild, to which only beauty shop owners belong. The membership of the Guild is composed

of approximately 100 beauty shop proprietors in the Seattle area. All were formerly members of the Beauticians' Local 195-A. Respondent Burpee, who owns two beauty shops in Issaquah and one in the Eastgate-Lake Hills area, is a member of the Guild. Local 195-A and the Guild are part of an international union, of which the Washington State Joint Council is another unit.

Assorted literature from the above union affiliates was introduced in evidence at the trial. This literature contained a statement that the union was fighting the commercial "profit schools" which had ceased being real schools and were being operated as cut-rate beauty shops. It was stated that these schools were taking $3,000,000 in business away from the state's beauty shops and licensed beauticians a year. Reference to this action against appellant and a concurrent one against another beauty school was said to have come about "through cooperation of the Guild, the beauticians union, and many interested individuals." Yet another piece of literature sent to all beauty shops stated:

"Your main problem is STILL the so-called commercial beauty schools—the 'profit schools' which operate as cut-rate beauty shops, IN COMPETITION WITH YOU, by using *unpaid* students as cheap labor."

We are convinced that, if respondents were actively engaged in this campaign against the beauty schools and motivated by economic considerations, they would be disqualified for bias to sit as members of the hearing committee with respect to the charges made against appellant.

Before discussing the facts that mitigate against the charge of bias because of association with the union which distributed the literature referred to above, we wish to discuss the case of *Smith v. Department of Registration & Education*, 412 Ill. 332, 106 N. E. (2d) 722 (1952). This is the only case which we have found where the members of an association, in toto, were held disqualified to sit on a hearing committee. The Department of Registration and Education revoked the license of Dr. Smith to practice medicine; this was upon the recommendation of the medical examining committee. The charges against Dr. Smith

related to his treatment of cancer by use of the "Koch Treatment," and that his claims of skill in treating cancer were untrue. The petition for disqualification of the examining committee contained the following charges of prejudice and bias:

" . . . The American Medical Association is a moving force behind the proceedings to revoke the license of appellant; that as an organization it has gone on record denouncing the 'Koch Treatment for cancer;' and that it has for the past few years entered upon a crusade to 'drive all doctors using it out of business;' that in the journal of A.M.A. from 1921 to 1949 there have appeared twenty-one articles viciously condemning the 'Koch Treatment;' that the American Medical Association has joined with the public press of Chicago in not only condemning the 'Koch Treatment' but in characterizing appellant as the number one quack of Chicago; that one of the members of the present committee is classified in the Chicago Medical Bluebook as a 'cancer specialist' and that he, like all adherents of the A.M.A., teaches and prescribes that there are three and only three methods of combating cancer, namely, radium, X ray or surgery; that all five of the members of the present committee not only hold membership in the American Medical Association but that they hold high offices therein and they are active in promoting and furthering the administration of its affairs; that since the American Medical Association has already prejudged the efficacy of the 'Koch Treatment,' it was not fair to require him to be tried by a committee, the membership of which is derived entirely from that organization; that he was fearful that he could not receive a fair trial from a group of men who are such important factors in the powerful medical association that is interested in this prosecution; that there are thousands of doctors in Chicago who are not identified with this organization, and that if the membership of this committee is recruited from that group he will more likely receive a fair trial."

The Illinois court noted that these charges went undenied, and were refuted only to the extent that the lawyer for the department said that, in his opinion, the committee would be entirely fair. After recognizing that the responsibility of protecting the public lies in the associations of the

leaders and ethical practitioners in the professions, the court stated that:

"... Under the special circumstances of this case, it is our opinion that the ends of justice and due process would have been better served if Dr. Smith's request for another hearing agency had been allowed."

Although the Illinois court's holding would appear to have embraced the entire A.M.A. as being disqualified to serve on the committee, emphasis in the charges themselves were against that particular committee, whose members were officers in the association.

In the instant case, respondent Burpee testified that she was not an active member of the Guild and that she did not even attend the Guild meetings. After excerpts from the union literature were read to her, she stated that if the facts stated were true, they were bad for the profession. She further stated that she had no reason to know if they were true, but that she had no reason to doubt them. Respondent Wolff is a member of, but not active in, the Beauticians' Union, and she is not a member of the Guild. Although she expressed the opinion that good schools are necessary, she believes that there are too many schools, and that the schools compete with beauty shops for patrons.

We conclude that membership in the union cannot, ipso facto, form a basis for disqualifying respondents, since they are not active therein and did not participate in bringing about the charges against appellant. We also conclude, however, that there is a common feeling among beauty shop owners that, in general, commercial beauty culture schools are in competition with beauty shops. If this common interest among shop owners is sufficient to disqualify respondents, it follows, a fortiori, that all shop owners are disqualified to sit on a hearing committee appointed to consider charges against any school owner in a license revocation proceeding.

In occupational, professional, and vocational licensing, it is the rule rather than the exception that members of the calling sit on licensing committees. Yet, indirectly, the grant of a new license or the revocation of an existing license can

be said to have an effect upon competition within the calling. There may be within a common calling certain groups where competition is greater between the groups than within the membership of any one of them. This has not, however, in itself been held to violate due process when one group predominates on a licensing board.

In *Prosterman v. Tennessee State Bd. of Dental Examiners*, 168 Tenn. 16, 73 S. W. (2d) 687 (1934), the defendant's license to practice dentistry was revoked. The defendant was an advertising dentist. The board of examiners was limited to dentists recommended for appointment by the state dental association; such association excluded all advertising dentists. It was held that the procedure was not unconstitutional where the courts were open for relief if the examiners acted arbitrarily or illegally.

In *Shearer v. State Medical Bd.*, 91 Ohio App. 277, 97 N. E. (2d) 688 (1950), the defendant's certificate to practice medicine was suspended for one year. The defendant was an osteopath practicing osteopathic medicine and surgery. The Ohio court held that the composition of the board, mostly medical doctors, did not deny the defendant a fair trial and hearing before the board nor did it deny him due process of law. See, also, *Lucas v. State ex rel. Bd. of Medical Registration & Examination*, 229 Ind. 633, 99 N. E. (2d) 419 (1951), where the defendant was a chiropractor and the licensing board was composed of members of the medical profession.

The leading case involving disqualification for interest is *Tumey v. Ohio*, 273 U. S. 510, 71 L. Ed. 749, 47 S. Ct. 437, 50 A.L.R. 1243 (1927). In that case, the mayor of a small town presided over the trial of persons charged with the illegal possession of liquor. The mayor received compensation only upon conviction and then only from the fines collected thereby. The supreme court held that a trial before a judge having a direct, personal, substantial, pecuniary interest in reaching a conclusion against the accused denied him due process of law. The court prefaced its holding by stating:

"All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion. . . ."

■ The legislative discretion doctrine is applicable in the instant case. The pecuniary interest of beauty shop owners in the outcome of the hearing to any one of them is indirect and speculative. The legislature having decided that qualified practitioners of the same calling are competent to be hearing examiners in a license revocation proceeding of other members, we will not single out one group from within the calling as unqualified. This is not in defiance of due process since, if any one hearing examiner is challenged, we shall consider the bias of this person as an individual against the licensee.

Respondent Burpee testified, in answer to the questions propounded to her in regard to her bias against appellant, as follows:

"Q. Have you a prejudgment as to what violations might be made by a beauty school owner or operator? A. Only what is required of me to know through the law. Q. The State Law? A. Yes. Q. Do you know of any violations of that law by the relator, Mrs. Jean Beddall? A. No, I don't. Q. Is your mind completely open with regard to the allegations respecting Mrs. Beddall? A. Yes, it is. Q. Do you believe yourself to be a fair and impartial person to hear this case? A. I do."

Earlier in the trial in regard to her pecuniary interest in the outcome of the trial, she was asked:

"Q. Do you believe that the beauty schools using these unpaid students are in competition with you and take trade away from you? A. No. They are not in competition to me."

Respondent Wolff made the following responses to similar questions:

"Q. Do you feel yourself to be a fair and impartial person? A. Yes, I do because I have been through it in all phases of the profession. Being a teacher and having had my own school and everything, I think I realize the school owner's problems, and the instructors' problems, the shop owners' problems, the operators' problems. Q. Do you have any bias

or prejudice against Mrs. Beddall? A. To tell the truth, I don't know Mrs. Beddall, one from the other in this room. If I were to see her, I wouldn't know which one is which. I see different ones in here, but I don't know definitely who is Mrs. Beddall. Q. Have you heard of her school located in Renton? A. Not until I was made aware that this was coming up. The Court: Not until when? A. Not until I was notified that the trial would be set, a set time set, or hearings would be set on Mrs. Beddall. And I made a point to not discuss it with anyone. I didn't want to discuss anything with anyone involved in any of this."

Viewing the facts as a whole, we hold that they do not constitute legal bias as a matter of law, and, consequently, we shall not disturb the trial court's finding of fact that respondents "are not biased or prejudiced against the relator [appellant] or the operation of her beauty school."

The names of respondents Burpee and Wolff were suggested to the director of licenses by Joseph E. Cloquet, Secretary of the Washington State Beauty Culture Board; the director, in turn, requested that the Governor appoint them. Mr. Cloquet explained that his reason for not requesting any beauty culture school owners or instructors to serve on the committee was twofold: (1) his belief that there was more direct competition between school owners because of enrollment policies, and (2) that the law requires that a school must *at all times* be under the supervision of a manager-operator and must maintain one instructor for each ten students, or fraction thereof (RCW 18.18.070). Mr. Cloquet, in explaining his second reason above, stated that school owners who are manager-operators do not have additional instructors (such instructors must have the qualifications of a manager-operator, RCW 18.18.010(10)) to relieve them of their duties; thus, in asking them to serve on the committee, he would be asking them to violate the law.

We believe that Mr. Cloquet, in representing the Department of Licenses has misinterpreted the law in regard to his second reason for not trying to secure any manager-operator or instructor-operator in a school to serve on the committee. In *Bizzelle v. State*, 134 Tex. Crim. 467,

116 S. W. (2d) 385 (1938), a statute was construed which prohibited the operation of a beauty shop or school unless it was "at all times under the direct supervision of a registered hairdresser or cosmetologist." The Texas court of criminal appeals approved the opinion of the commissioner of appeals that "at all times" must be given a rational construction consistent with the legislative intent and must be construed as meaning all reasonable times. We think that such an interpretation should apply to our own statute and thus allow a manager or instructor in a school to serve on a hearing committee if the department deems it desirable to form a more judicious committee.

We are aware of the tremendous growth of administrative agencies both within this state and throughout the nation. These agencies, such as the Department of Licenses and its subdivisions, are created by the legislature, and their functions are prescribed by the various statutory provisions applicable to each agency. Their operation may include legislative, administrative and/or judicial functions. In our highly complex society, the usefulness of these agencies is apparent. Their use and importance emphasize the necessity for their operation in a manner which will leave unblemished the faith of the American people in their government. These considerations make apt the following quotation from *Inland Steel Co. v. National Labor Relations Bd.*, 109 F. (2d) 9, (1940), where the court said:

"The Act authorizes the Board to enter an order upon a complaint alleging unfair labor practices, only after a 'hearing.' This must mean a trial by a tribunal free from bias and prejudice and imbued with the desire to accord to the parties equal consideration. There is perhaps no more important right to which litigants are entitled than that they be given such a trial. Its impairment, ipso facto, brings the court, and administrative bodies as well, into public disrepute, and destroys the esteem and confidence which they have enjoyed so generally. Time and experience have demonstrated that the public, as well as litigants, will tolerate the honest mistakes of those who pass judgment, but not the biased acts of those who would deprive litigants of a fair and impartial trial. Foremost among the responsibilities

imposed upon a reviewing court, is to make sure that this foundation of our Judicial system be not undermined." p. 20.

The scope of our holding in the present case can be measured by resort to the following state and federal decisions: *State ex rel. Barnard v. Board of Education*, 19 Wash. 8, 52 Pac. 317 (1898); *State ex rel. Caffrey v. Superior Court*, 72 Wash. 444, 130 Pac. 747 (1913); *State ex rel. McFerran v. Justice Court*, 32 Wn. (2d) 544, 202 P. (2d) 927 (1949); *In re Borchert*, 57 Wn. (2d) 719, 359 P. (2d) 789 (1961) (see both majority and dissenting opinions); *In re Murchison*, 349 U. S. 133, 99 L. Ed. 942, 75 S. Ct. 623 (1955); *National Labor Relations Bd. v. Phelps*, 136 F. (2d) 562 (1943); *Inland Steel Co. v. National Labor Relations Bd.*, *supra*.[1]

The object of the Beauty Culture Act can be only to promote the safety, health, morals, and general welfare of the public. *In re Flynn*, 52 Wn. (2d) 589, 328 P. (2d) 150 (1958); *Brown v. Seattle*, 150 Wash. 203, 272 Pac. 517 (1928). The regulation of the beauty culture industry is not to benefit economically any particular segment thereof. See annotation: Validity, construction, and effect of statute or ordinance regulating beauty shops, or beauty culture schools, 56 A.L.R. (2d) 879 (1957). In affirming the judgment of the superior court, we desire to point out that, if the hearing to be held by the hearing committee is not conducted fairly, or bias is there evidenced, resort to the courts to review its proceedings is provided for under the provisions of the Administrative Procedure Act, RCW 34.04.130.

The judgment of the superior court is hereby affirmed.

OTT, C. J., FINLEY, WEAVER, and HAMILTON, JJ., concur.

---

[1] General discussion of issues here involved can be found in the following law reviews: Note, Disqualification of Administrative Officials for Bias, 13 Vanderbilt L. Rev. 712 (1960); Note, Disqualification on the Ground of Bias as Applied to Administrative Tribunals, 23 Canadian B. Rev. 168 (1945); Note, The Disqualification of Administrative Officials, 41 Colum. L. Rev. 1384 (1941).