[No. 44536. En Banc. May 18, 1978.]

THE POLYGON CORPORATION, *Appellant,* v. THE CITY OF SEATTLE, ET AL, *Respondents.*

*Bogle & Gates, Ronald E. McKinstry, Ronald T. Schaps,* and *E. McDuff Archibald,* for appellant.

*John P. Harris, Corporation Counsel,* and *J. Roger Nowell* and *Gordon Crandall, Assistants,* for respondent City of Seattle, et al.

*Hillis, Phillips, Cairncross, Clark & Martin, P.S.,* by *Susan R. Agid* and *Jerome L. Hillis,* for respondent Caine, et al.

HICKS, J.—The Polygon Corporation brought this action against the City of Seattle and the Superintendent of Buildings to review a decision denying Polygon's application for a building permit. The denial was based on the proposed building's adverse impact on the environment. The superintendent found substantive authority to deny the application in the State Environmental Policy Act of 1971 (SEPA). RCW 43.21C. Expressing agreement, the trial court denied Polygon's petition for a writ of mandamus and granted the City's motion for summary judgment. We accepted direct review and we affirm the trial court.

In 1974, Polygon laid plans for the construction of a 13-story condominium on Queen Anne Hill property zoned RMH (Multiple Residence High Density Zone). Prior to filing its application for a building permit, Polygon submitted an "environmental information worksheet" to the building department. The department determined that the issuance of a building permit would be "major [action] significantly affecting the quality of the environment . . ." RCW 43.21C.030(2)(c). This determination, unchallenged by Polygon, made necessary the preparation of an Environmental Impact Statement (EIS) concerning the proposed project. A draft EIS was prepared and circulated.

Believing the draft EIS indicated some environmental problems, the superintendent scheduled a meeting for January 27, 1975, with Polygon, its architects, and opponents of the condominium to discuss possible changes in the plans that would make the project more acceptable. On

January 22, 1975, after the meeting had been arranged, an article appeared in a local newspaper reporting the mayor's opposition to the Polygon project.

Blaine McCool, one of Polygon's architects, met with the superintendent the day following publication of the mayor's views. According to McCool's affidavit, the superintendent stated that because of the mayor's opposition, he would announce that the permit application would be denied. On the other hand, the superintendent asserts that his decision to deny the permit was not reached until it was announced in May.

On April 8, 1975, Polygon filed its building permit application with the building department. A final EIS was published April 14, 1975. It disclosed that the proposed project would have a number of adverse environmental impacts of varied significance including, among others, view obstruction, excessive bulk and excessive relative scale, increases in traffic and noise, and shadow effect.

The EIS also discussed several alternatives to the proposed project. These included construction of a 4– and 8– story building on the proposed site and construction of the 13–story building on a different site. The design alternatives were less adverse in environmental terms. In addition to the technical information, the EIS also included the comments of numerous Queen Anne Hill residents who opposed the project.

By written decision issued May 9, 1975, the superintendent denied the application, stating that the project was inconsistent with the aims of SEPA. The most significant impact was found to be visual, but additional factors listed were the adverse effects on property values and the trend toward more intense land use on Queen Anne Hill. Other impacts disclosed by the EIS were found to be acceptable.

On August 15, 1975, Polygon petitioned the King County Superior Court for a writ of review and mandamus. By stipulation, several persons, individually, and United South Slope Residents, a citizen's group, intervened. After reviewing the record and considering the argument of the

parties, the trial court issued an oral opinion denying the writ of mandamus and granting summary judgment to the City and intervenors. The trial court found that: (1) SEPA conferred on the superintendent the discretion to deny building permits on the basis of environmental considerations; (2) the decision to deny the permit here was not "arbitrary and capricious"; and (3) the doctrine of appearance of fairness did not apply to the building permit application process. Judgment was entered accordingly.

Polygon first contends that SEPA does not create in the superintendent the authority to deny a building permit which he is otherwise directed to issue under applicable laws and regulations. We disagree.

SEPA sets forth a state policy of protection, restoration and enhancement of the environment. RCW 43.21C.020. Since SEPA's enactment, this court has on a number of occasions discussed the significance of that policy and its application to subordinate agencies of government. *Stempel v. Department of Water Resources*, 82 Wn.2d 109, 508 P.2d 166 (1973); *Eastlake Community Council v. Roanoke Assocs., Inc.*, 82 Wn.2d 475, 490, 513 P.2d 36, 76 A.L.R.3d 360 (1973); *Leschi Improvement Council v. State Highway Comm'n*, 84 Wn.2d 271, 279–80, 525 P.2d 774 (1974).

Procedurally, the environmental protection policy is to be implemented by the preparation and circulation of an environmental impact statement disclosing the environmental impacts of the proposed action. RCW 43.21C-.030(2)(c). Polygon urges that this procedural duty is all that SEPA requires. It contends that SEPA serves only an "informational" purpose and does not confer substantive authority to act with reference to the environmental impacts disclosed. Such a reading of SEPA would thwart the policies it establishes and would render the provision that "environmental amenities and values will be given appropriate consideration in decision making" a nullity. RCW 43.21C.030(2)(b).

We have said that SEPA requires the disclosure and full consideration of environmental impacts in governmental

decision making. *Norway Hill Preservation & Protection Ass'n v. King County Council*, 87 Wn.2d 267, 552 P.2d 674 (1976). That mandate would be meaningless under the facts of this matter if the superintendent was powerless to decide in the manner that "full consideration of environmental impacts" impelled. It necessarily follows that SEPA confers substantive authority to the deciding agency to act on the basis of the impacts disclosed.

This view was presaged by the Court of Appeals when it stated:

> The essential point is that SEPA requires the City, acting through its city council, actually to consider the various environmental factors. The change in the substantive law brought about by SEPA introduces an element of discretion into the making of decisions that were formerly ministerial, such that even if we assume, arguendo, that the issuance of a grading permit was, prior to SEPA, a ministerial, nondiscretionary act, SEPA makes it legislative and discretionary.

*Juanita Bay Valley Community Ass'n v. Kirkland*, 9 Wn. App. 59, 73, 510 P.2d 1140 (1973), *review denied*, 83 Wn.2d 1002 (1973).

A 1977 amendment to RCW 43.21C.060 (Laws of 1977, 1st Ex. Sess., ch. 278, p. 961), though not applicable to this case, strongly indicates this to be the legislature's view. RCW 43.21C.060, which establishes that the policies and goals of SEPA are supplementary to existing authorizations, was amended by the addition of the proviso which significantly limits the government's authority to condition or deny action. The addition of the limiting proviso evinces the legislature's understanding that, in the absence of such limitation, very broad discretion to condition or prohibit was conferred by the act.

Polygon insists, however, that SEPA does not confer discretion here where prior to its enactment the superintendent's duties were ministerial. *State ex rel. Craven v. Tacoma*, 63 Wn.2d 23, 27, 385 P.2d 372 (1963). The Seattle Municipal Code § 3.03.020(e) provides in pertinent part:

If the superintendent of buildings is satisfied that the work described in an application for permit and the plans filed therewith conform to the requirements of this Code and other perti[n]ent laws and ordinances . . . he shall issue a permit therefor to the applicant . . .

RCW 43.21C.060, however, added to that authority by providing:

The policies and goals set forth in this chapter are *supplementary to those set forth in existing authorizations* of all branches of government of this state, including . . . municipal . . . corporations . . .

(Italics ours.) Thus, SEPA has been said to "overlay" the requirements which existed prior to its adoption. *Sisley v. San Juan County*, 89 Wn.2d 78, 83, 569 P.2d 712 (1977).

Since 1971 when it was enacted, SEPA is one of the "pertinent laws" which the superintendent must be satisfied is met before he issues a building permit. To the extent that the issuance of a building permit is a "major action significantly affecting the quality of the environment", that issuance is no longer a ministerial act.

We hold that SEPA confers on the City, acting through its superintendent of buildings, the discretion to deny a building permit application on the basis of adverse environmental impacts disclosed by an EIS.

Polygon next contends that since its project complied with existing zoning regulations, the denial of its building permit application amounts to a de facto rezone of its property. Accordingly, it argues that the denial violates the doctrine of vested rights. *Hull v. Hunt*, 53 Wn.2d 125, 331 P.2d 856 (1958). Polygon also asserts that the City has failed in its burden of demonstrating that the "rezone" was reasonably required by the public health, safety, morals or welfare. *State ex rel. Wenatchee Congregation of Jehovah's Witnesses v. Wenatchee*, 50 Wn.2d 378, 312 P.2d 195 (1957).

We find no de facto rezone of the property since the permit denial was not based on the intended multifamily

use, but rather on the environmental impacts of the particular plan submitted. The zoning was not changed and Polygon was not deprived of the opportunity to develop its property under that zoning within the parameter of allowable environmental impacts. The EIS here involved even suggests alternative configurations for a multifamily building with less adverse environmental impacts.

Since the permit denial was not a rezone, either in law or in fact, the doctrines and rules which attend such action are not applicable.

Polygon then argues that if SEPA is found to confer substantive authority, it is unconstitutional as an unlawful delegation of legislative power. We have determined that SEPA does confer upon the City the authority to apply the standards expressed in SEPA to the building permit application of a particular property owner. The constitutional requirements for such a delegation are that: (1) the legislature provide standards defining generally what is to be done and what body is to accomplish it; and (2) procedural safeguards be established to control arbitrary administrative action. *Rody v. Hollis,* 81 Wn.2d 88, 500 P.2d 97 (1972); *Barry & Barry, Inc. v. Department of Motor Vehicles,* 81 Wn.2d 155, 500 P.2d 540 (1972).

As to the first requirement, RCW 43.21C.030 defines generally the responsibilities of all governmental entities. More specific guidance can be found in RCW 43.21C.010 and .020 which define the purposes and policies of SEPA. These standards, though not a model of specificity and clarity, are sufficient under the applicable test. This is particularly true since environmental considerations are not amenable to precise quantification. *Yakima County Clean Air Authority v. Glascam Builders, Inc.,* 85 Wn.2d 255, 258, 534 P.2d 22 (1975).

As to procedural safeguards, we note that SEPA does not act in isolation, but rather as a supplement to or an overlay of other governmental authorization. Thus, operative procedural safeguards can be found not only in SEPA, but in the underlying statutes, ordinances and practices of the

agency concerned. One such safeguard lies in the fact that Seattle's building permit application process provided ample opportunity for Polygon to present its views. The record indicates that Polygon's representatives met frequently with building department officials to discuss various aspects of the project.

An additional, more significant safeguard is the availability of judicial review of the entire record under the clearly erroneous standards.[1] This review, broader than that under the arbitrary and capricious test, ensures that permit issuance will not lie solely within subjective discretion of the decision maker. We find these procedural safeguards and the general standards of SEPA sufficient to uphold the act against the challenge that it unlawfully delegates legislative power.[2]

Polygon also challenges the trial court's refusal to apply the appearance of fairness doctrine to the building permit application process. It contends that the superintendent based his decision on the mayor's opposition to the project, rather than the environmental data, thus creating an appearance of partiality and unfairness. We agree with the trial court that the doctrine does not apply.

The appearance of fairness doctrine was first applied in *Smith v. Skagit County*, 75 Wn.2d 715, 453 P.2d 832 (1969), to provide a due-process type standard for statutorily *required hearings* of a legislative body acting in a quasi-judicial capacity. It has never been applied to administrative action, except where a public hearing was

---

[1]The adoption of the clearly erroneous standard is discussed below.

[2]We note that recent amendments to RCW 43.21C.060 will result in greater certainty and predictability as to the substantive application of SEPA. As amended, that section provides that government action may be conditioned or denied only on the basis of impacts disclosed by the relevant environmental documents and set out in writing. Within specified periods of time, such denials or conditions must be based on policies incorporated into the regulations or ordinances of the appropriate governmental authority. Greater procedural protection is also afforded by the provision for appeal of decisions by nonelected officials to the legislative authority of the acting agency.

required by statute. *See Seattle v. Loutsis Inv. Co.,* 16 Wn. App. 158, 173, 554 P.2d 379 (1976). The appearance of fairness requirements which have been developed for hearings are inappropriate in the building permit application process which necessarily involves frequent informal contacts between the applicant and employees of the building department.

This is not to say, however, that allegations of partiality will go untested by the court. The standard against which we test such allegations must be whether the allegations, if found to be true, demonstrate actual partiality precluding fair consideration of an application. *See State ex rel. Beddall v. Lonctot,* 62 Wn.2d 845, 384 P.2d 877, 97 A.L.R.2d 1201 (1963). That partiality would be present where it was probable that a denial was based on considerations outside the record, rather than on an evaluation of the EIS.

Here, even if we accept as factual Mr. McCool's affidavit, Polygon has failed to demonstrate partiality rising to the necessary level. Even if the superintendent said he would base a denial on the mayor's opposition, the fact is that the application was not denied until several months later. During that time, meetings were held, changes in plans were suggested and discussed, and the final EIS was compiled and published. The superintendent asserts that his decision was based solely on the impacts as revealed by the EIS and was finally reached only 24 hours before it was announced. In light of this record, we are not convinced that such partiality as would have precluded a fair consideration of the application has been demonstrated.

■ The only issue remaining concerns the standard by which the superintendent's decision will be reviewed. In *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 552 P.2d 674 (1976), we held that "negative threshold determinations" were subject to review under the clearly erroneous test. This result was based on our determination that close review was necessary to ensure that the policies of SEPA were achieved. We find

it equally important that the same broad standard of review be available to a property owner whose property use has been limited by the denial of a building permit on the basis of SEPA.

It has long been recognized that substantive and procedural safeguards are necessary to protect property owners from abusive and arbitrary land use regulations.[3] While we have indicated that specific protections developed in the zoning area are not applicable to a building permit denial, we recognize that the same potential for abuse exists. This is particularly true in view of the fact that environmental factors, especially those involving visual considerations, are not readily subject to standardization or quantification. That potential for abuse is even stronger where the decision must be made in a climate of intense political pressures.

We believe that this potential for abuse, together with a need to ensure that an appropriate balance between economic, social, and environmental values is struck, requires a higher degree of judicial scrutiny than is normally appropriate for administrative action. Consequently, in order that there be a broad review, we apply the clearly erroneous standard to the superintendent's denial of Polygon's building permit.

In applying the clearly erroneous test to an administrative decision, we examine the entire record and all the evidence in light of the public policy contained in the legislation authorizing the decision. *Ancheta v. Daly,* 77 Wn.2d 255, 461 P.2d 531 (1969). The court does not substitute its judgment for that of the administrative body and may find the decision "'clearly erroneous'" only when it is "'left with the definite and firm conviction that a mistake has been committed.'" *Ancheta,* at 259–60.

▮ As indicated in the superintendent's decision, the most significant environmental impacts of the proposed

---

[3]*See, e.g., Hull v. Hunt,* 53 Wn.2d 125, 331 P.2d 856 (1958); *Chrobuck v. Snohomish County,* 78 Wn.2d 858, 480 P.2d 489 (1971); *Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969); *Parkridge v. Seattle,* 89 Wn.2d 454, 573 P.2d 359 (1978).

project were aesthetic in nature. The building would have blocked views from properties to the north, northeast and northwest of the site as well as from the viewpoint at Kerry Park. Such blockage would have had a potentially adverse effect on the value of the properties involved. The building would have been totally out of scale with other structures in the neighborhood. Nonvisual impacts would also have resulted from the construction of the project. The building would have blocked sunlight and cast a shadow over surrounding properties. Traffic and noise would have been increased. While this court has not held that aesthetic factors alone will support an exercise of the police power, such considerations taken together with other factors can support such action. *Department of Ecology v. Pacesetter Constr. Co.*, 89 Wn.2d 203, 571 P.2d 196 (1977).

In addition to the immediate impacts of this project, concern was voiced that its construction would heighten the trend toward more intense land use with its attendant environmental problems. A proposed project's potential for creating pressure to alter surrounding land use may properly be evaluated in a decision of this nature. *See Save a Valuable Environment (SAVE) v. Bothel*, 89 Wn.2d 862, 576 P.2d 401 (1978). The cumulative impact from other similar projects may also be taken into account. *Hayes v. Yount*, 87 Wn.2d 280, 552 P.2d 1038 (1976).

All factors are to be considered in light of the public policy expressed in SEPA of maintenance, enhancement and restoration of the environment. RCW 43.21C.020. The visual or aesthetic element is recognized as part of the environment that is to be maintained and enhanced. RCW 43.21C.020(2)(b).

In view of the public policy of SEPA, the level of impacts disclosed by the EIS, and the availability of less adverse alternatives, we are not "left with a definite and firm conviction that a mistake has been committed" and, accordingly, cannot say that the superintendent's decision was "clearly erroneous."

Affirmed.

Wright, C.J., and Rosellini, Hamilton, Stafford, Utter, Brachtenbach, Horowitz, and Dolliver, JJ., concur.