[No. 67336-0-I. Division One. November 13, 2012.]

JACQUELYN NICHOLS, *Respondent*, v. SEATTLE HOUSING
AUTHORITY, *Appellant*.

*James E. Fearn Jr.* (of *Seattle Housing Authority*); and *Shelby R. Frost Lemmel* and *Kenneth W. Masters* (of *Masters Law Group PLLC*), for appellant.

*Allyson G. O'Malley-Jones* (of *Northwest Justice Project*), for respondent.

¶1 BECKER, J. — A low-income tenant prevailed in an informal hearing on Seattle Housing Authority's decision to terminate her rent subsidy. The housing authority rejected this decision and scheduled a new hearing before a different hearing officer. The second hearing officer sustained the housing authority's decision to terminate the tenant's housing voucher. On a writ of review, the superior court ordered reinstatement of the tenant's voucher. We affirm. The superior court correctly determined that the first hearing examiner did not exceed his authority and therefore his ruling was final and binding.

## FACTS

¶2 Jacquelyn Nichols obtained a Section 8 Housing Choice Voucher from the housing authority in about 1985. Section 8 is a federally funded program that provides residential rent subsidies to low-income tenants for securing rental housing on the open market. The subsidy pays the difference between the market rent and 30 percent of the tenant's family income. Tenants are required to report changes in family income to the housing authority within 10 days. Tenants also undergo annual reviews to verify their reported income.

¶3 In 2002, the housing authority alleged Nichols had failed to report some income from work, resulting in a $759 overpayment. Nichols disputed the overpayment but signed a repayment plan. She stopped paying after a few months, and her Section 8 voucher was terminated, with $640 still owing. Nichols and her daughter, who was born in the mid-1990s, became homeless.

¶4 In 2008, Nichols obtained a new Section 8 voucher. In 2009, the housing authority discovered the old outstanding debt, which had been overlooked in 2008 when Nichols was granted the new voucher. In October 2009, the housing authority asked Nichols to sign an agreement to reinstate the 2002 repayment agreement and begin to make payments on the old $640 debt. Nichols again disputed the debt but ultimately decided to sign the agreement to make payments on it.

¶5 Meanwhile in 2009, Nichols and her daughter both received increases in income from Social Security. Nichols began receiving Social Security disability payments because she had a diagnosed mental health disability. Nichols reported her own increase in income after several months, but she did not report her daughter's increase in income.

¶6 At the time of Nichols' annual review in May 2010, the housing authority had learned of the daughter's increased income. Taking that income into consideration along with Nichols' delay in reporting her own increase, the housing authority calculated that Nichols had been overpaid in the amount of $3,074.

¶7 On May 25, 2010, the housing authority sent Nichols a letter informing her that her Section 8 voucher was terminated "for violation of your participant obligations." The letter asserted that a new repayment plan was not possible because Nichols already had an existing repayment plan on the old debt: "Since you are currently in the process of repaying a debt to the housing authority, you are not eligible to enter into a new Payment Agreement for the

newly determined overpayments in lieu of termination." The amount still unpaid on the old debt from 2002 was $316.

¶8 Nichols requested an informal hearing to challenge the decision that her existing repayment agreement made her ineligible to qualify for a new one. Independent Hearing Officer M. Varn Chandola presided over the hearing. Nichols did not deny the income increases or that she had failed to timely report the income. She said that her failure to timely report income was unintentional and her mental health disability caused her difficulty in dealing with and reading paperwork. She asked to be allowed to enter into a repayment plan in lieu of termination because she and her daughter would be homeless if terminated from the program. She said that their previous experience of homelessness had been "horrific."

¶9 Chandola ruled in favor of Nichols, finding that the housing authority did not justify its decision to terminate her voucher. He noted that the housing authority was relying on the old unpaid debt from 2002 to make the case that it lacked the authority to offer Nichols a payment plan for her current debt in lieu of termination. Under federal regulations and chapter 19A of the housing authority's administrative plan, the housing authority was prohibited from offering a participant a payment plan for newly incurred debt while she was still in the process of paying off preexisting debt. Chandola observed, however, that chapter 19C of the plan provided that the 2002 debt should have been "written off" in 2008. He reasoned that because the 2002 debt was no longer due, the agreement of October 2009, in which Nichols again promised to pay off that old debt, was null and void. Therefore, the housing authority failed to establish that it lacked the discretion to offer Nichols a payment agreement for her current debt.

¶10 A week later, the housing authority's general counsel, James Fearn, wrote Nichols a letter informing her that the housing authority would not be bound by Chandola's decision. He explained that in the housing authority's view,

Chandola had exceeded his authority. According to Fearn, Chandola had misinterpreted the legal meaning of the phrase "written off" and he should not have considered chapter 19C because it was not expressly raised by Nichols in her notice of appeal. The letter, which Fearn copied to Chandola, stated, "The Hearing Officer will prepare another hearing decision that does not include a consideration of Section 19C of the Section 8 Administrative Plan."

¶11 Chandola refused to prepare another decision, citing ethical concerns. "While there are legitimate means by which Mr. Fearn can challenge or refuse to follow the hearing officer's decision, he crosses the line by demanding that the hearing officer issue a new hearing decision which incorporates his perception of the law."

¶12 Fearn then directed a second hearing officer, Joan Kalhorn, to hold a new hearing on the merits of Nichols' appeal. After two hearings, Kalhorn concluded that while Chandola could not be faulted for his interpretation of chapter 19, his premises were "misguided" and it was "beyond the authority" of a hearing officer to insist that the housing authority offer a payment plan to Nichols instead of terminating her. Kalhorn upheld the housing authority's termination decision because it was "not arbitrary or capricious" and was "reasonable under the circumstances."

¶13 The superior court granted Nichols' application for a writ of review. The court found that Chandola's initial decision was binding on the housing authority. The court ordered the housing authority to reinstate Nichols' voucher and offer her a repayment agreement.

¶14 The housing authority appeals.

## ANALYSIS

1. The superior court did not err by granting a writ of review

■ ¶15 Initially, the housing authority contends the superior court erred in granting the writ of review. Our

review of the decision to grant a writ of review is de novo. *City of Seattle v. Holifield*, 170 Wn.2d 230, 240, 240 P.3d 1162 (2010).

¶16 A writ of review is an extraordinary remedy granted by statute. *Holifield*, 170 Wn.2d at 239-40. The statute is RCW 7.16.040. One basis for granting a writ of review is when an "inferior tribunal, board or officer, exercising judicial functions," has acted illegally and no appeal nor any plain, speedy, and adequate remedy at law exists. RCW 7.16.040; *Holifield*, 170 Wn.2d at 240, 246. One way in which a tribunal, board, or officer "acts illegally" is by committing an obvious error that would render further proceedings useless. *Holifield*, 170 Wn.2d at 244-45.

¶17 Nichols' petition for a writ of review fulfilled the criteria for granting discretionary review. She alleged that both Kalhorn and Fearn had "exercised judicial functions by applying law to facts and issuing adjudicatory opinions," that the termination decision was made without authority after Chandola's decision became binding on the housing authority, that the termination decision was based on unlawful procedures and erroneous interpretation of the law, and that she lacked any other avenue of judicial review. Nichols attached the challenged decisions to her petition.

¶18 We agree with the superior court's finding that Nichols had "no other avenue of review" and that "the grounds have been sufficiently laid to establish that probable error was committed."

2. The decision to be reviewed is the decision of the first hearing officer

¶19 Nichols asked the superior court to review the legality of the housing authority's decision to nullify Chandola's ruling. She argued that the court had to review Chandola's decision to determine whether the housing authority had authority to reject it. The housing authority argued that the only decision to be reviewed was Kalhorn's. The superior court agreed with Nichols:

The issue, however, is which hearing examiner's decision are we looking at. And I am persuaded that we don't even get to the second hearing examiner's findings of fact and issues of law, because the issue is whether or not that second hearing examiner should have even held a hearing.

¶20 On appeal, the housing authority contends this court must review the merits of Kalhorn's final decision and construe her findings of fact in favor of the housing authority, the prevailing party before that forum.

■ ¶21 On appeal of a writ of review, this court reviews the challenged administrative decision on the record of the administrative tribunal, not of the superior court operating in its appellate capacity. *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 29-30, 891 P.2d 29 (1995); *Seattle Police Dep't v. Werner*, 163 Wn. App. 899, 906, 261 P.3d 218 (2011). This court reviews the " 'decision of the body that makes the findings and conclusions relevant to the decision.' " *Mansour v. King County*, 131 Wn. App. 255, 262, 128 P.3d 1241 (2006), quoting *Davidson v. Kitsap County*, 86 Wn. App. 673, 681, 937 P.2d 1309 (1997). Issues of law are reviewed de novo. *Hilltop*, 126 Wn.2d at 29. Issues of fact are reviewed for substantial evidence. *Hilltop*, 126 Wn.2d at 29. Ultimately, the court must determine whether the administrative agency acted arbitrarily, capriciously, or contrary to law. *Mansour*, 131 Wn. App. at 263. The court may also reverse the agency decision when it is " 'clearly erroneous.' " *Mansour*, 131 Wn. App. at 263, quoting *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 68-69, 578 P.2d 1309 (1978).

■ ¶22 The challenged administrative decision is the housing authority's refusal to be bound by Chandola's decision. This decision was declared by Fearn's letter of July 15, 2010, in which Fearn stated that Chandola's decision was not binding because Chandola had exceeded his authority. The relevant findings and conclusions, accordingly, are those made by Chandola.

¶23 The housing authority states, correctly, that Kalhorn was "the only officer to make findings on the housing authority's decision not to be bound by Chandola's ruling." But Kalhorn's starting point was to decide whether Chandola had exceeded his authority. That was the central question for Kalhorn, for the superior court, and now for this court. We begin by reviewing Chandola's decision, not Kalhorn's.

3. <u>The first hearing officer did not exceed his authority, so his decision was binding on the housing authority</u>

¶24 The housing authority contends the superior court erred in reinstating Chandola's decision. The housing authority argues Chandola exceeded his authority by failing to consider all material facts and by failing to conform his ruling to the relevant law.

¶25 Hearing officers in a voucher termination hearing are required to "consider all relevant facts"; "adjudicate all material factual issues"; and "conform their rulings to all relevant legal authority," including any federal, state, and local law, and policies of the housing authority or of the United States Department of Housing and Urban Development.[1] The applicable regulations permit the housing authority to reject a hearing officer's decision that conflicts with or contradicts any federal, state, local, or agency law or policy, or that "exceeds the authority" of the hearing officer.[2]

¶26 To determine whether Chandola exceeded his authority, we review the record before him. We review his conclusions of law de novo and his findings of fact for substantial evidence. *Hilltop*, 126 Wn.2d at 29.

¶27 Chandola conducted an hour long hearing on the record on June 24, 2010. Both parties were permitted to

---

[1] ADMINISTRATIVE PLAN FOR THE SEATTLE HOUSING AUTHORITY HOUSING CHOICE VOUCHER PROGRAM ch. 20-8 (Nov. 2003, rev. July 2011).

[2] 24 C.F.R. § 982.555(f)(1)-(2); ADMINISTRATIVE PLAN ch. 20-9.

make argument, introduce evidence, present witnesses, and ask questions of the opposing party. Chandola also asked questions of both parties and of Nichols' only witness, her teenage daughter.

¶28 Chandola issued a six page decision on July 6, 2010. He concluded that the housing authority had failed to establish the legal position that it "primarily and ultimately" relied on as a basis for terminating Nichols from the program: that under chapter 19A of the administrative plan, her existing repayment plan signed in October 2009 disqualified her from eligibility for a new repayment plan. Chandola's decision cited relevant regulations and portions of the administrative plan. His decision was well reasoned.

¶29 Chandola stated that "the sole issue" in the case was whether the housing authority "properly relies on Chapter 19 of its administrative plan" to terminate Nichols from the voucher program. The housing authority contends the chapter 19 agreement was not the sole issue. The housing authority argues that Chandola exceeded his authority because he "never addressed" the issue of whether Nichols failed to report her increased family income.

¶30 This complaint is unfounded. Chandola's ruling plainly refers to the facts presented by the housing authority concerning the overpayment of $3,074. Nichols did not contest the overpayment; she contested only the housing authority's choice of remedies. So her failure to report income did not present any material factual issue that Chandola was required to adjudicate.

¶31 The housing authority's central argument is that Chandola exceeded his authority by failing to consider what the housing authority calls its "key legal theory": that, independent of the repayment plan issue and chapter 19, administrative regulations at 24 C.F.R. §§ 982.551(b) and .552(c)(1)(i) gave the housing authority a permanent grant of authority to terminate Nichols for failing to report increased income.

¶32 This argument is also unfounded. Chandola did consider the effect of these regulations. He cited the specific regulatory subsections in his decision, acknowledged that they provided the housing authority with the discretion to terminate Nichols, and pointed out that the housing authority "could have taken the position" that these regulations alone justified the termination action. Chandola's decision gave the housing authority's legal theory full and proper consideration.

¶33 Chandola based his decision on a finding of fact: that in presenting its case, the housing authority had "primarily and ultimately" relied on Nichols' repayment agreement on the old debt as the basis for declaring her to be ineligible for another payment plan. This finding was supported by substantial evidence. *Hilltop*, 126 Wn.2d at 29. Nichols' failure to report income was plainly the basis for the housing authority's decision to take *some corrective action* against her. But the housing authority repeatedly set up the existing repayment agreement as the basis for choosing termination as the *appropriate remedy*. Indeed, Nichols was told in the letter of May 25, 2010, that termination was the *only* available remedy because the existing repayment agreement made her ineligible to have a new payment plan in lieu of termination.

¶34 The housing authority's oral argument before Chandola made clearer still that the existing repayment agreement was fundamental to the decision to terminate Nichols. The housing authority began its presentation of argument and evidence by informing Chandola that the housing authority had "a policy" under which they could permit tenants to enter into a repayment agreement when they fell behind in payments.

[THE HOUSING AUTHORITY]: And so I want that to be noted, that this is a policy we have, that if we do know that there is some noncompliance we can start a payment agreement with the family.

[CHANDOLA]: What page is that again, Ms. Myers?

[THE HOUSING AUTHORITY]: It's right at the very first page that I gave you.

The housing authority then pointed out for Chandola that under chapter 19A of the administrative plan, "the housing authority will generally not enter into a payment agreement when there is an existing payment agreement between the housing authority and the participant." In Nichols' case, the housing authority explained, this meant that a violation of her participant obligations would result in termination rather than a repayment agreement because she was "already under another payment agreement" and "we don't enter into a second payment agreement."

¶35 Thus, it appears that the housing authority consciously chose to frame its termination decision as the inexorable outcome of applying chapter 19A's rule prohibiting multiple repayment agreements. Chandola acted within the scope of his authority as a hearing officer when he examined chapter 19C and discovered that the 2002 debt should have been written off. He reasonably concluded the housing authority was "unable to demonstrate by a preponderance of the evidence that the new debt repayment agreement of October 15, 2009 is a valid agreement upon which it may ultimately base its termination action against the participant."

¶36 Because Chandola did not exceed his authority, the housing authority was bound by his ruling. We affirm.

GROSSE and LAU, JJ., concur.